# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| 1800 W. LAKE STREET LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 14 C 420 |
| ) | |
| AMERICAN CHARTERED BANK ) | |
| and SCHERSTON REAL ) | |
| ESTATE INVESTMENTS, LLC, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff 1800 W. Lake Street, LLC obtained a loan from American Chartered Bank, repayment of which was secured by a mortgage on real estate located at 1800 W. Lake Street in Chicago. Plaintiff and its affiliates also obtained other loans from American Chartered related to other parcels of real estate, as well as loans to pay taxes on those properties. Plaintiff was in danger of defaulting, and it entered into a series of forbearance agreements with American Chartered. Under one of those agreements, plaintiff agreed to place a deed to the 1800 W. Lake property in escrow so that if it defaulted, the bank would have the right to record the deed in lieu of foreclosing on its mortgage. Under the parties' agreement, if American Chartered recorded the deed, certain of plaintiff's loans from the bank would be deemed paid in full.

Plaintiff defaulted, and American Chartered, through its affiliate Scherston Real Estate Investments, LLC, recorded the deed to the 1800 W. Lake property. Plaintiff

thereafter filed for bankruptcy and later filed an adversary proceeding against American Chartered and Scherston, seeking to set aside the transfer of the 1800 W. Lake property under 11 U.S.C. § 548 as a fraudulent transfer. Plaintiff alleges that it did not receive reasonably equivalent value in exchange for the transfer.

The Court previously denied defendants' motion for summary judgment. *See 1800 W. Lake St. LLC v. Am. Chartered Bank*, No. 14 C 420, 2014 WL 7330924 (N.D. Ill. Dec. 22, 2014). The Court conducted a bench trial on July 6-8, 2015. This constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

**Discussion**

Under section 548, a bankruptcy trustee or (as in this case) a debtor in possession may avoid a transfer as constructively fraudulent if it shows that the debtor "received less than a reasonably equivalent value in exchange for such transfer" and was insolvent at the time of the transfer or became insolvent as a result. 11 U.S.C. § 548(a)(1)(B). It is undisputed that plaintiff was or became insolvent at the relevant time. The only issue is whether plaintiff received reasonably equivalent value in return for the transfer of the 1800 W. Lake Property. As the Seventh Circuit held in a related case, "[r]easonably equivalent should be understood to mean not part payment but that the debtor received or will receive value for the property that he transferred that is as close to true equivalence as circumstances permit." *1756 W. Lake St. LLC v. Am. Chartered Bank*, 787 F.3d 383, 387 (7th Cir. 2015).

The first question is what the plaintiff received. The parties stipulated that the indebtedness owed by plaintiff as of October 2013 when the bank recorded the deed

was $1,775,287. Under the parties' agreement that provided for the deed in lieu of foreclosure, this debt was to be forgiven upon the bank's recording of the deed. The bank, however, kept sending plaintiff payment notices even after recording the deed and, in those notices, continued to accrue interest. Plaintiff says this means the debt is still due and that it essentially got nothing in return for the transfer of the 1800 W. Lake property. When asked at trial why payment notices have continued to go out, the bank's representative, Bryn Perna, said this was because plaintiff's filing of bankruptcy threw the recording of the deed into doubt. That explanation doesn't fit well with the evidence. The bank continued to send payment notices not only before plaintiff filed the present lawsuit challenging the deed transfer but also during the two month period after recording the deed before plaintiff had even filed for bankruptcy. Having heard the evidence, however, the Court believes this is best chalked up to a combination of institutional practice and inertia. The parties' contract is crystal clear that plaintiff's indebtedness is extinguished by the recording of the deed, as the bank admitted at and after trial. Thus plaintiff received at least $1,775,287 in value from the transfer of the property.

Plaintiff also received other benefits in connection with the various forbearance agreements and loan modifications. The Seventh Circuit's decision in the *1756 W. Lake St. LLC* case makes it clear that the value of these benefits is considered in assessing what the debtor received in return for the transfer. *1756 W. Lake St. LLC*, 787 F.3d at 387-88 ("If the value [plaintiff] derived from the forbearance agreements and related concessions from the bank equaled or exceeded" the property's value, plaintiff "ended up where it wanted to be.").

3

By reason of the bank's forbearances, plaintiff was able to stay in business and earn income for several years. The bank showed that plaintiff made about $870,000 in gross income (before taxes and depreciation) from the date of the first forbearance in 2009 through the date the bank recorded the deed. The bank also contends that there was additional value inherent in having payment deferred for several years. The Court, however, has a hard time seeing a viable basis to attribute a monetary figure to this over and above the income plaintiff earned during that period, particularly in light of the fact that plaintiff had to pay or at least was charged interest during that period (albeit less than the "default" rate of interest due under the parties' agreement, again as a result of the bank's forbearance).

The bank's argument that the Court should take into account value received by another business owned by plaintiff's owner Christopher Bambulas fares better, at least in part. In connection with one of the forbearance agreements, Bambulas obtained a $350,000 loan to purchase another business. That business earned $177,000 before taxes and depreciation in the period between the making of the loan and the recording of the 1800 W. Lake deed. The Court does not see the $350,000 loan as extra value that should be counted—it was a loan that had to be repaid, not a gift—but the $177,000 in income is appropriately considered.

The bottom line is that in addition to the debt forgiveness of $1,775,000, plaintiff received about $1,047,000 in additional value, for a total of about $2,820,000.

The next question is what the plaintiff gave up. Each side called an appraiser to testify. Plaintiff's appraiser said the property was worth $2,710,000—$760,000 for the improved portion, consisting of a building an adjacent lot, and $1,950,000 for the

4

remaining vacant land.  The bank's appraiser said the property was worth $1,985,000—$535,000 for the improved portion and $1,450,000 for the vacant land.

Appraisals aside, Bambulas testified credibly that at the point when the bank recorded the deed, he had a solid offer from his tenant, a landscaping business, to purchase the property for $2.4 million.  This, in the Court's view, was the best evidence of the value of the property, not the retrospective appraisals that each side obtained from paid experts.

Bambulas further testified that the bank's representative Perna told him that she had said to the tenant, in substance, why should you buy the property from Bambulas for $2.4 million when you can buy it from the bank (once it recorded the deed) for $1.7 million.  Bambulas also testified that on a different occasion, Perna told him that she didn't want to see him make "a dime" on the property.  The bank made no effort to contradict this testimony when it called Perna to testify.  The Court found Bambulas's testimony credible.  But although the bank engaged in sharp and arguably unethical practices, the fact is that plaintiff got at least as much as it gave up:  $2.8 million is greater than $2.4 million.  Indeed, the value the Court has found plaintiff received in connection with the transfer exceeds even the amount of its expert's appraisal, which was somewhat suspect in any event because it did not take into account that the "no further remediation" letter that plaintiff had received from Illinois environmental regulators limited certain physical modifications.  But the Court need not make a definitive determination that this appraisal lacked credibility given its finding that plaintiff received value that exceeded the amount of the appraisal.

For these reasons, the Court finds that plaintiff 1800 W. Lake Street LLC did not

sustain its burden of proof and therefore directs the Clerk to enter judgment in favor of defendants American Chartered Bank and Scherston Real Estate Investments, LLC.

This leaves one matter on the table, specifically an issue the Court raised at trial regarding the falsity of a representation made by Perna in an affidavit the bank submitted in support of its motion for summary judgment. In that motion, the bank argued that even if the property was worth more than the value plaintiff received, plaintiff would get any excess proceeds, which meant things would even out. The sole support for this contention was a statement in an affidavit by Perna, in which she said:

> Upon the sale of the Property, any proceeds American Chartered receives in excess of the outstanding balance under the Original Note and Real Estate Tax Note, if any, will be applied to loans of Plaintiff's affiliates and insiders cross-collateralized with the Original Note and Real Estate Tax Note *and any remaining proceeds, if any, will be refunded to Plaintiff.*

Dkt. No. 17, Perna Affid. ¶ 34 (emphasis added).

When the Court ruled on the summary judgment motion, it did not buy this contention—either Perna's affidavit or the argument by counsel based on the affidavit—because it appeared to contradict the parties' written agreement. The Court said the following:

> Defendants' primary argument seems to be that even if the Property is worth what plaintiff contends, any surplus that might exist after its sale would be applied to loans owed by plaintiff's affiliates and any surplus remaining after that would be refunded to plaintiff. Thus, defendants argue, what they actually will get does not exceed reasonably equivalent value of what plaintiff gets. Plaintiff disputes this, saying that defendants' contention about what would happen to a surplus is speculative. *See* Defs.' LR 56.1 Stat. ¶ 68; Pl.'s Resp. to Defs.' LR 56.1 Stat. ¶ 68. In support of their contention on this point, defendants cite an affidavit submitted by an officer of American Chartered. But this contention in the affidavit is not supported by citation to any of the voluminous documents that accompany the affidavit. *See* Affid. of Bryn Perna ¶ 34. And from the Court's reading, the forbearance agreement says the opposite; it provides that plaintiff and its affiliates "shall remain 100% liable for all other

6

liabilities other than solely relating to the [Original Note] and [Tax Note]."
Defs.' Mem. Ex. M at 4. The Court sees nothing (nor do defendants cite
anything) in the forbearance agreement or its amendments that indicates
that a surplus upon American Chartered's disposition of the Property
would go to plaintiff as it would have in the event of a foreclosure sale—
the route that American Chartered avoided by way of the forbearance
agreement.

*1800 W. Lake St. LLC*, 2014 WL 7330924, at *4.

At trial, Perna, under questioning by the bank's lawyer, repeated the testimony that the Court had previously found suspect:

> Q: Okay. Now, if the bank sold 1800 W. Lake Street for more than the amount of the loan at the time it recorded the deed, what would happen to that excess money?
>
> A: It would have been applied to the loans it was cross-collateralized with.
>
> Q: And those are what?
>
> A: 1756 and API.
>
> Q: *Okay. Would the bank return any of those excess funds to Mr. Bambulas?*
>
> A: *Only to the extent that there were funds left over after the repayment of principal, interest, and fees.*

July 8, 2015 Tr. 15 (emphasis added). The Court was somewhat surprised at the repetition of this statement, so it asked Perna about it after the completion of her testimony on direct, cross, and redirect. When pressed for the basis for her statement, Perna abruptly did a one-eighty:

> Q: So you said earlier that if it happened that, you know, after you sold these property and there was money left over after all the loans were all paid off, that that money would be given back to the borrower, right?
>
> A: That's correct.

7

| Q: | Where would I find that in these documents? |
|---|---|
| A: | I believe that's the law. |
| Q: | Where is it the law? I mean, you've got an agreement with these people that say[s] that you're taking this deed in lieu of foreclosure and that you get to record the deed, you know, in the existence [sic] of certain events, and it really doesn't say anything about what happens after that. So where is the law? |
| A: | Oh, I'm sorry. |
| Q: | What law are you talking about? |
| A: | I'm sorry. *If we prevail and the deed is ours, then if there is profit in the property, it is allowed to be kept by the bank.* |
| Q: | Okay. |
| A: | But in the event that it's a loan – |
| Q: | To be clear, that's different than what you said before. That's what I thought, but that's different than what you said before. |
| A: | Okay. I apologize. |

*Id.* 42-43 (emphasis added).

After the conclusion of the trial, the Court again noted the contradictory statement Perna had made in her affidavit submitted on the motion for summary judgment, described the significance of this in relation to that motion, and said it appeared Perna earlier statements under oath were false. *Id.* 73-76. About a week later, the bank filed a motion seeking leave to amend Perna's affidavit and correct the related filings by the bank. In the motion, the bank acknowledged that the statement in Perna's affidavit was incorrect. It asked to file an amendment, in which Perna says she "subsequently became aware of an error" in the affidavit. The amended version says that any excess proceeds would be applied to the other related loans, period. Perna provided no

8

explanation for the error. The bank's counsel stated in the motion that Perna "did not generate the error"; that counsel could recall no discussion about what would happen if there were excess sale proceeds after satisfying the related loans; and that defendants "never contemplated that proceeds from the sale of the Property could ever exceed the cross-collateralized loans." Dkt. No. 68, Mot. for Leave to Amend Affid. of Bryn Perna ¶ 4.

Defendants also say that they "*never* advanced the statement in error in any arguments before this Court to support its [sic] motion for summary judgment . . ." and that "[t]he only time" they discussed the issue of excess proceeds was in paragraph 3 of their reply brief. *Id.* ¶ 5. That is simply incorrect. Defendants highlighted the point in the penultimate paragraph of the statement of facts in their opening summary judgment brief, saying that "any subsequently remaining proceeds, if any, will be refunded to Plaintiff." Dkt. No. 19 ¶ 26. It was quite apparent from the ruling on summary judgment that the Court regarded this as a significant point asserted by defendants, as indicated in the passage from the ruling quoted earlier. Despite this, however, defendants made no effort after the ruling to try to correct what they now acknowledge was an error. To the contrary, as indicated in the passage from Perna's trial testimony quoted earlier, they actually tried to advance the point *at trial.* See July 8, 2015 Tr. 15.

The Court was not taken in by either the false statement in Perna's affidavit or her false testimony on direct examination, largely because these statements were inconsistent with the parties' agreement. That does not make the false statements any less material. They certainly were capable of influencing the decision maker, even if they did not actually end up doing so.

Defendants try to chalk this up to inattention, saying they didn't notice the Court's comments about this in its summary judgment ruling and, more generally, that they never contemplated the possibility that any excess proceeds would exceed the total of all the related-party loans. The explanation, however, does not fit with what defendants did at the trial. As quoted earlier, counsel elicited from Perna, on direct examination, testimony that excess proceeds would be returned to Bambulas. That aside, the explanation is unsatisfactory. This is recklessness, not mere inattention.

The Court denies defendants' motion to amend Perna's affidavit. The affidavit was submitted in support of a motion for summary judgment that is no longer before the Court for ruling. Thus amendment would accomplish nothing. The affidavit, the arguments that were based on it, the testimony at trial, and the post-trial explanation all will remain part of the record.

The Court orders defendants and their counsel to show cause why they should not be found to have violated Federal Rule of Civil Procedure 11(b) via the affidavit and summary judgment filings and to have violated 28 U.S.C. § 1927 via those filings and the trial testimony. The Court advises that if it ends up finding a violation, it would be inclined to require payment of plaintiff's attorney's fees relating to the summary judgment motion as well an additional sanction or penalty for effective deterrence. *See* Fed. R. Civ. P. 11(c)(4). The Court would also be inclined to deny an award of costs to defendants despite their prevailing-party status. Defendants should address these points in their show-cause submission.

## Conclusion

For the reasons stated above, the Court directs the Clerk to enter judgment in

favor of defendants American Chartered Bank and Scherston Real Estate Investments, LLC and against plaintiff 1800 W. Lake Street LLC.  In addition, as stated above, defendants and their counsel are ordered to show cause why they should not be sanctioned.  Defendants' responsive submission is to be filed by September 8, 2015.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 25, 2015